UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3: 07-CV-0341-B |
| LOCKHEED MARTIN CORPORATION, | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Plaintiff L-3 Communications Integrated Systems, L.P. ("L-3") has sued competitor Defendant Lockheed Martin Corporation ("Lockheed") alleging violations of sections 1 and 2 of the Sherman Act and tortious interference under Texas state law based on Lockheed's alleged acts in the non-U.S. international market for refurbishment of P-3 aircraft. Lockheed moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss all six claims brought by L-3. Lockheed argues that L-3's four antitrust claims are barred as a matter of law, because (1) L-3 has not alleged an injury of the type that the antitrust laws were meant to prevent, (2) L-3 has no standing because the injury alleged is too speculative in nature, and (3) Lockheed's commercial speech concerning its intellectual property is not actionable under the antitrust laws. Lockheed further argues that it has absolute affirmative defenses to those claims, and its state law claims, based on its alleged threats of litigation under the *Noerr-Pennington* doctrine and the Texas litigation privilege. Finally, Lockheed also asserts that L-3 has not pled the essential elements of its two tortious interference claims.

Having considered Defendant Lockheed's Motion to Dismiss the Complaint (doc #33) and

Brief in Support, Plaintiff L-3's Response Thereto, Defendant's Reply and all evidence and arguments submitted, the Court finds that the Motion should be DENIED as follows.

## BACKGROUND

The following factual summary is derived from the Plaintiff's Corrected Complaint filed on March 1, 2007. Defendant Lockheed is the original manufacturer of a propeller-driven aircraft, now known as the P-3, which was designed for and is used by the U.S. and foreign militaries in anti-submarine warfare and maritime patrols. (Compl. ¶¶ 7, 13, 21).[1] Beginning in the late 1950's, when design and construction of the aircraft that would become the modern P-3 began, the U.S. Government delivered data to the contractors working on the aircraft development. (Compl. ¶¶ 7-8). As a contractor on various projects related to the P-3, L-3 or its predecessors have had access to technical data, including manuals, drawings, and technical specifications for many years. (Compl. ¶ 8). Further, under Department of Defense directive 5230.25 and through FOIA, considerable additional P-3 data has been released publicly over the last few decades. (Compl. ¶ 9). L-3 also currently has a twenty year license from Lockheed to use proprietary data related to flight avionics and mission systems, as well as a license from the Commonwealth of Australia to use its data related to the P-3 aircraft. (Compl. ¶ 9).

As the only original manufacturer of the P-3 in the world, Lockheed has complete control over the market for new P-3 aircraft, including setting a price for a new plane.[2] (Compl. ¶¶ 7, 14).

---

[1]The Complaint referred to herein is the Corrected Complaint.

[2]Lockheed has recently charged $75-80 million per P-3 aircraft and attempted to charge $125 million per aircraft, but it is unclear whether any planes have been sold at the latter price. (Compl. ¶¶ 14-15).

However, there are a limited number of competitors in the aftermarket for the P-3, including Plaintiff L-3. (Compl. ¶ 11). The aftermarket for the P-3 is particularly significant, because the original aircraft is so expensive that most buyers will not replace the aircraft as technology advances, but will instead contract with suppliers to upgrade systems and replace worn parts. (Compl. ¶ 22). Lockheed has a dominant share of the refurbishment aftermarket for the P-3 in terms of both machining and providing parts and the service of design and installation for the refurbishment. (Compl. ¶ 24). The P-3 parts market is very limited, even considering potential suppliers other than Lockheed, because the tooling used to create the parts is very expensive–taking many months and considerable money to build. (Compl. ¶ 27). Because the work on the P-3 has been ongoing for decades, some suppliers have developed parts that are superior to other suppliers or may not be available from another source. (Compl. ¶ 28).

In 2004, L-3 and Lockheed both bid on a Request for Proposal issued by the Republic of Korea for refurbishment of eight P-3 aircraft that Korea had purchased from the U.S. Navy. (Compl. ¶ 16). L-3 positioned itself as a subcontractor to prime contractor Korean Aircraft Industries, Ltd. ("KAI"), and Lockheed submitted its bid as a prime contractor. (Compl. ¶¶ 17-18). KAI and L-3 won the contract with Korea ("Contract") with a bid of $427.5 million compared to Lockheed's $435 million bid. (Compl. ¶ 19). The Contract includes time tables for performance by KAI and L-3, with associated penalties for late delivery. (Compl. ¶ 26). In addition to Korea, several other countries, including Canada, India, Taiwan, and Australia, have announced plans to refurbish their existing P-3 fleets or to purchase P-3's that will require refurbishment. (Compl. ¶ 20).

L-3 contends that after Lockheed lost the bid on the Korean P-3 refurbishment, it took steps to make it difficult for L-3 to complete the Contract and to bid on the refurbishments announced

by other foreign countries. (Compl. ¶¶ 26-43). First, Lockheed has blocked L-3's access to tooling by refusing to do its part in the largely ministerial process of obtaining/granting permission for use of the tooling owned by the U.S. Navy. (Compl. ¶ 27). Second, Lockheed has repeatedly advised L-3's suppliers that they will have legal problems if they supply L-3 for the Korean Contract, has retaliated against those who continue to work with L-3, and has threatened the suppliers of the suppliers. (Compl. ¶¶ 30, 34, 40). L-3 has offered to indemnify its suppliers, but many have been so threatened by Lockheed that they refuse to work with L-3 at all. (Compl. ¶¶ 30, 38). Third, Lockheed has also threatened to pull distributorships from potential suppliers for L-3 and has promised suppliers lucrative large purchase orders if they will refuse to deal with L-3. (Compl. ¶¶ 34, 39). Fourth, in 2005, Lockheed filed a lawsuit against L-3 in federal court in Georgia alleging, *inter alia*, misappropriation of trade secrets for L-3's use of the data Lockheed asserts is proprietary. (Compl. ¶ 29 and doc #1 in *Lockheed Martin Corp. v. L-3 Comms. Corp. and L-3 Comms. Integrated Sys., LP*, Civil Action No. 1:05-CV-902-CAP, in the Northern District of Georgia).

According to the Complaint, Lockheed recently implemented a general practice of forcing its suppliers to sign a data license agreement, which purports to license Lockheed's proprietary information on the P-3 only for use on domestic contracts. (Compl. ¶ 32). Lockheed has used these licenses to threaten its suppliers by asserting that they are not allowed to do business with L-3 on foreign government contracts, including the Korean Contract, because the license is not applicable for foreign contracts. (Compl. ¶¶ 32-33). Lockheed has also asserted these licenses against L-3 in telling KAI, L-3's prime contractor, that L-3 is supporting violations of those agreements in performing the Korean Contract. (Compl. ¶ 41). Lockheed has made similar claims to Korea directly and preemptively to other foreign P-3 owners and potential owners who might choose L-3

as the contractor on their refurbishment projects. (Compl. ¶ 41). The data that Lockheed purports to license and uses as the basis for its threats to suppliers is largely not proprietary and was not asserted as such by Lockheed for many years or has become public. (Compl. ¶¶ 9, 10, 31, 37). However, Lockheed has also sued L-3 in federal court in Georgia alleging that L-3 wrongfully used the allegedly proprietary data in obtaining the Contract and continues to wrongfully use it to perform that Contract. (Compl. ¶ 9).

L-3 maintains that Lockheed's actions have already injured it by forcing it to defend a baseless lawsuit and to incur penalties for late deliveries on the Contract. (Compl. ¶ 42). Further, if Lockheed continues to succeed in threatening L-3's suppliers and they refuse to perform on their contracts with L-3, L-3 maybe not be able to perform the Contract at all. (Compl. ¶¶ 43, 45). If Lockheed is successful in convincing the other foreign countries interested in refurbished P-3's that L-3 cannot provide services to them, Lockheed will effectively be the sole source in the P-3 refurbishment services market and the only purchaser of aftermarket P-3 parts. (Compl. ¶ 45).

In February 2007, L-3 filed the instant lawsuit seeking to enjoin Lockheed from interfering with its contracts and with the market for non-U.S. P-3 refurbishment.[3] Lockheed asked this Court to stay these proceedings and also asked the court in Georgia to enjoin L-3 from proceeding in Texas with its antitrust and tortious interference claims. Lockheed's motions were denied by both courts, and on February 8, 2008, Lockheed filed the instant Motion to Dismiss all of L-3 claims asserting that L-3 has no antitrust injury and no standing to bring any antitrust claims. Lockheed also alleges

_____

[3]Although L-3's antitrust claims allege violations of the Sherman Act, L-3's ability to bring such claims derives from sections 4 and 16 of the Clayton Act, which authorizes antitrust suits by private parties who are threatened with antitrust loss or damage. 15 U.S.C. §§ 15, 26.

that its conduct is protected, as a matter of law, by certain affirmative defenses and that L-3 has not

pled all of the elements of tortious interference. L-3 responds arguing that Lockheed misreads its

pleading and ignores its request for injunctive relief.

## ANALYSIS

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim, the Court accepts all well-pleaded facts as true, viewing them in the light most

favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467

(5th Cir. 2004). Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely

granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004). A 12(b)(6) motion to

dismiss should be granted only if the complaint does not include "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The

Court's review is limited to the allegations in the complaint and to those documents attached to a

defendant's motion to dismiss to the extent that those documents are referred to in the complaint

and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir.

2004).

### Analysis of Antitrust Claims

1.     Antitrust injury

Antitrust injury is a component of standing to bring claims under either sections 1 or 2 of the

Sherman Act. *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1185 (5th Cir. 1988). Antitrust injury is

"injury of the type the antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation

or of anticompetitive acts made possible by the violation. It should, in short, be "'the type of loss that

the claimed violations . . . would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (citation omitted).

The Court finds Lockheed's argument that an antitrust injury cannot occur after a contract has been entered into to be a misreading of the Court's holding in *Davray*–the primary case upon which Lockheed relies. *Davray, Inc. v. City of Midlothian, Texas*, No. 3:04-CV-0539-B, 2005 WL 1586574 (N.D. Tex. Jul. 6, 2005). *Davray* is inapposite for several reasons. First, as Lockheed appears to acknowledge in its briefing, this Court's decision in *Davray* was based on a finding that the defendant's actions did not have a substantially adverse impact on competition–one of the elements that the plaintiff in that case was required to prove to support its claims under section 1 of the Sherman Act. *Davray*, 2005 WL 1586574 at * 13. The Court expressly did not rule on the element of the propriety of the antitrust injury alleged by the plaintiff in *Davray*.[4] *Id.* at * 14.

Second, none of the dicta in *Davray*, or the cases cited therein and relied upon by Lockheed, is based on any of the fundamental legal theories asserted by L-3. Davray was a bidder on a construction contract with the defendant City, which had established in its request for proposal on that contract that a fire hydrant from a particular manufacturer must be used to fill the contract. *Id.* at ** 1-2. Davray bid on the contract with that knowledge and then later sued the manufacturer and the City for conspiracy in restraint of trade under section 1 of the Sherman Act. *Id.* at * 3. In finding that there was not a substantially adverse impact on competition from the City requiring use of a particular fire hydrant, this Court found that Davray's proof that its profit margins were harmed

---

[4]Moreover, the *Davray* case cited by Lockheed was a determination on summary judgment, not on a motion to dismiss. Clearly there is a stark difference between determining whether allegations, taken as true, support one element of an antitrust claim and determining whether sufficient evidence has been adduced to prove each element of a particular antitrust claim.

by this requirement did not suffice to show how competition was harmed by the City's requirement. *Id.* at * 14.

In so holding, this Court cited cases involving similar legal theories, including *Sec. Fire Door Co. v. County of Los Angeles*, 484 F.2d 1028, 1030 (9th Cir. 1973), which rejected a contractor's specification of use of a certain product as the basis for claims of conspiracy by a bidder on the contract. *Id.* at **14-16. In finding that there could not be a conspiracy in restraint of trade between a purchaser of a product and its supplier under those circumstances, the Ninth Circuit stated that "once a purchaser's choice of product has been exercised competition is, of course, at an end...the proscription against restraint of trade *in this context* seeks only to assure that the choice of product has been made freely under circumstances where the play of competition has been available rather than in response to anticompetitive factors such as coercion on the part of the supplier." *Sec. Fire*, 484 F.2d at 1030 (emphasis added).

While the Ninth Circuit's reasoning applied in *Davray*–a factually analogous case–it is not remotely applicable here. The allegations that the *Security Fire* court was addressing were pre-contract purchaser-supplier conspiracy claims. Unlike the *Security Fire* plaintiff, L-3 is not alleging a conspiracy between the purchaser Korea and anyone. L-3's Sherman Act section 1 claims are (1) illegal tying by Lockheed and (2) Lockheed's forced agreements with L-3 suppliers as illegal agreements in restraint of trade. There are no allegations that Korea's choice of supplier is causing damages to L-3, as Korea has not required any specific supplier for any parts for the P-3. In fact, it is Lockheed's interference with the existing suppliers in the P-3 parts market that is one basis of L-3's alleged injury. Further, unlike *Security Fire*, neither Korea nor Lockheed's pre-contract actions form the basis for any of L-3's claims. All of L-3's allegations concern Lockheed's post-contract actions

- 8 -

that L-3 alleges interfere with L-3's performance of its contractual obligations under the Korean Contract. Finally, contrary to Lockheed's suggestion, there is alleged injury to the ultimate consumer in this matter, as performance delays by L-3 ultimately effect timely delivery of the aircraft to consumer Korea.

L-3 alleges the same type of antitrust injury that the Fifth Circuit found stated a claim in *Doctor's Hospital*. In *Doctor's Hospital*, the plaintiff hospital, a direct competitor of defendant hospital, alleged that defendant hospital conspired with a hospital alliance to remove plaintiff from the alliance to weaken it as a competitor of defendant hospital. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance*, 123 F.3d 301 (5th Cir. 1997). The plaintiff hospital alleged damages from the loss of alliance revenues and damage to its ability to compete effectively in the market. *Id.* at 304. The Fifth Circuit found that the plaintiff hospital stated an antitrust injury because its "alleged losses and competitive disadvantage" flowed from the allegedly exclusionary conduct of defendant hospital and "fall easily within the bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* at 305.

L-3 has alleged that it is losing profits due to Lockheed's interference, as L-3 has to pay performance penalties when its deliveries are late and has to pay more for parts on a rushed basis or for tooling to be made by new suppliers, because its former suppliers have been threatened and therefore refuse to deal with L-3 now. L-3 has also alleged that on a going-forward basis, it has been disadvantaged by Lockheed's interference and maligning its reputation not only with Korea, but with other countries who have indicated that they intend to refurbish their P-3 aircraft. These injury allegations are extremely similar to those in *Doctor's Hospital*. *See also Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983) (affirming appellate court finding that pleadings alleging that nonunion firms coerced contractors to give

business to them stated a violation of antitrust laws while noting that "[c]oercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect."). L-3's alleged damages stem directly from the conduct it alleges violates the antitrust laws–Lockheed's various acts of interference, such as threatening and coercing suppliers to refuse to deal with L-3 and lying to suppliers, customers, and potential customers about L-3's ability to do business. These are classic allegations of antitrust injury. *Brunswick*, 429 U.S. at 489.

2.     Antitrust Standing based on Future Contract Claims

As the Supreme Court observed in *Cargill*, "section 16 [of the Clayton Act] gives any...company...the right to go into court and enjoin the doing of [acts in violation of the Sherman Act]...instead of having to wait until the act is done and the business is destroyed and then sue for damages." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986). Lockheed presses the Court to dismiss L-3's antitrust claims to the extent that they are based on allegations that Lockheed is interfering with L-3's ability to compete for future P-3 contracts with foreign governments. Lockheed argues that L-3 has no standing to pursue such claims, because alleged antitrust injury based on contracts that may never occur is too speculative. The Court disagrees.

Accepting Lockheed's argument would effectively eviscerate section 16 of the Clayton Act. L-3's allegations that foreign governments have announced plans to refurbish their existing P-3's or to consider purchasing P-3's that will need to be refurbished are sufficient to survive a motion to dismiss as pled. Under *Cargill*, L-3 does not have to wait until the foreign governments have contracted with someone else to bring a claim–that is the equivalent of suing for damages. Thus, L-3 must be able to bring its claim at some point prior to the actual award of a contract. It is unclear

when, under Lockheed's theory, L-3 could state a claim based on threatened, as opposed to actual, loss. Moreover, Lockheed's argument that damages are too speculative because the governments might change their minds and not pursue P-3's is somewhat disingenuous in light of the allegations that Lockheed has already approached those governments and made false statements about L-3. (Compl. ¶ 41). If the contracts and plans were really so speculative, there would have been no reason for Lockheed to approach the governments at all.

Further, the cases cited by Lockheed do not persuade the Court to require more definitive plans from the foreign governments at this point in the litigation. First, none of the cases involve similar facts involving future contracts. Second, the only Fifth Circuit case cited by Lockheed, *Bell v. Dow Chem. Co.*, 847 F.2d 1179 (5th Cir. 1988), was determined on summary judgment after years of discovery. Many of Lockheed's other citations were also summary judgment cases. In refusing to dismiss L-3's antitrust claims as speculative at this point, the Court is not making a determination that claims based on future contracts would not ultimately be speculative in the summary judgment context after evidence is presented as to the certainty of the foreign government P-3 contracts. Third, in the primary case cited by Lockheed disposed of at an early phase, *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998), the court found that the antitrust injury was too speculative, because the plaintiff would never be able to prove that the alleged injury was caused by any prohibited conduct, as the defendant was regulatorily prevented from awarding a contract to the plaintiff. As discussed above, the Court has not found, at this time, that there is no way that L-3 could prove that an antitrust injury was caused by Lockheed's conduct.[5] Thus, L-3's antitrust claims

---

[5]As Lockheed properly notes, in *Taylor Publishing*, the Fifth Circuit cited an antitrust treatise that argues that tortious interference with current contracts should not be cognizable under section 2 of the

based on future foreign governments contracts will not be dismissed as speculative.

3.      Commercial Speech

Lockheed also argues that L-3's antitrust claims should be dismissed, because they involve allegations of commercial speech by Lockheed that is presumptively protected as a matter of law under the circumstances at hand.  Lockheed relies on a presumption, elucidated by several courts across the country, that commercial speech, such as comments on rivals, products, or advertising, presumptively has only a *de minimis* effect on competition and therefore cannot be the basis of a Sherman Act claim.  L-3 counters by arguing that its claims encompass more than just commercial speech and that they overcome any presumption that speech has only a *de minimis*, non-actionable effect on competition.

As an initial matter, it is important to note that the *de minimis* presumption referred to by the parties has neither been adopted nor commented upon by the Fifth Circuit and is therefore not necessarily the law in this case.  In 1998, the Southern District of Texas applied the presumption in the context of summary judgment on rival disparagement, defamation, and advertising as potential bases for antitrust actions, citing previous application by the Ninth and Second Circuits.  *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998) *citing Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.*, 108 F.3d 1147, 1151, 1152 (9th Cir.1997) and *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 n. 41 (2d Cir.1979).  The *Aldridge* court used a conjunctive six-factor test to determine whether the plaintiff had rebutted the presumption that allegedly disparaging statements have a *de minimis* effect on competition, evaluating

---

Sherman Act.  *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 484 (5th Cir. 2000).  However, the Fifth Circuit expressly did not adopt that treatise's statement or base its holding on that idea.  *Id.*

whether the statements were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to consumers having little understanding of the subject matter, (5) continued for extended time periods, and (6) not readily susceptible to counter statement, explanation, or other neutralizing effort or offset by the plaintiff. *Aldridge*, 995 F. Supp. at 749.[6]

The specific six factor test developed and applied by various courts is relatively consistent with the Fifth's Circuit fundamental view of the nature of exclusionary conduct sufficient to support a Sherman Act claim. *See Taylor Publ'g*, 216 F.3d at 481 (" in attempted monopolization cases a practice is exclusionary if it is 'of the type that tends to impair the opportunities of rivals based on something other than competition on the merits'") (internal citation omitted); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) (noting that the court would examine the defendant's behavior throughout the "contracting process to determine whether it relied on a superior product or business acumen in pursuing its goals, or had recourse to methods beyond competition on the merits"). As the *Stearns* court observed, it is not a violation of antitrust law to vigorously tout one's own product, however when the consumer has been manipulated, bribed, or coerced, an exclusionary claim may be stated. *Id.* at 526-527. This general theory appears to dovetail with the six factors elucidated by other courts considering the issue of actionable disparaging speech. The six factors essentially examine whether a speaker is using false information to mislead

---

[6]This test originated in the case law in the Second Circuit case of *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs*, 850 F.2d 904, 916 (2d Cir. 1988) in which the court adopted the test based on a suggestion in an antitrust treatise. In applying the test, the court reversed a dismissal, at the preliminary stage, of a violation of the Sherman Act based on publication of a letter about the plaintiff's product, which the plaintiff alleged was false and misleading. The court also appeared ready to balance the six factors in its ultimate determination (instead of applying them conjunctively), as it allowed discovery to proceed even though it found it unlikely that the plaintiff would succeed on factors four or five. *Id.* at 916-917.

people under circumstances when a counter explanation is unlikely to be effective–a method that would clearly fall outside of the Fifth Circuit's rubric of competition on the merits. Although it is a close call, at this stage, the Court finds that L-3 has alleged sufficient facts to state a claim.

The Court agrees with Lockheed that all of L-3's allegations boil down to the essential speech in which Lockheed is alleging that it owns certain data that is necessary for various aspects of refurbishment of P-3 aircraft, that a license is necessary for anyone (suppliers, sub-suppliers, etc.) to use that data, and L-3 does not have such a license for use on foreign contracts. This speech is clearly material to both actual and potential L-3 suppliers who have been threatened with legal or economic reprisals from Lockheed if they supply L-3. L-3 has alleged that at least some suppliers have relied on the speech in refusing to supply Lockheed and, considering the ongoing battle between L-3 and Lockheed in federal court in Georgia centering on the propriety of Lockheed's data rights claims, the Court cannot say that suppliers' or potential customers' reliance on Lockheed's speech is unreasonable. Similarly, L-3 has alleged that the speech by Lockheed is false and the Court cannot say at this juncture that Lockheed's speech is true as a matter of law.[7] The foreign governments and sub-suppliers targeted by the speech, and possibly even L-3's direct suppliers, may not have sufficient understanding of the nuances of Lockheed's claims, which also makes those claims less susceptible to attempted offsets by L-3. Finally, L-3 has alleged that Lockheed's speech began immediately after the award of the Korea Contract and has continued since then. Thus,

---

[7]Although the *Aldridge* court and others use the term "clearly false," the Court finds that terminology more appropriate in the original false advertising cases from which the six factor test derived, where a consumer might be able to readily examine a physical product to determine whether the speech was false. While the Court finds that the extent of the falsity of the statement may be relevant to the believability of the speech, and hence its ultimate exclusionary effect, it cannot be said that simply because the parties disagree about whether something is false that a claim based on that disputed statement would fail as a basis for an antitrust claim at the preliminary motion to dismiss stage.

regardless of whether the Court applies the six factor test or follows general principles, the Court cannot say at this stage that L-3 cannot succeed as a matter of law on its antitrust claims based on Lockheed's speech. L-3 has stated allegations that, if proven, could constitute the type of competition based on falsehoods and threats that is exclusionary conduct in violation of the Sherman Act. Lockheed's motion to dismiss the antitrust claims based on commercial speech is therefore denied.

4.    *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine provides immunity to an antitrust defendant facing allegations that its commencement and prosecution of a lawsuit violates antitrust law. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).[8] The Fifth Circuit has found that pre-litigation conduct normally attendant to effective litigation, such as threats of litigation, is also covered under this defense, noting that " if litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *Coastal State Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983). Under *Noerr-Pennington*, no antitrust liability arises from litigation unless the antitrust plaintiff can demonstrate that the litigation is a sham. *Prof'l Real Estate*, 508 U.S. at 57. Litigation is a sham when (1) the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" **and** (2) "the baseless lawsuit conceals an attempt to interfere directly with the business relationship of

---

[8]The *Noerr-Pennington* doctrine originated in two Supreme Court cases–*Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), which established the constitutional immunity flowing from the right of petition to the government. The Supreme Court later extended immunity to specifically include petition to the judicial branch through litigation activities. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).

a competitor." *Id.* at 60.

Lockheed argues that the *Noerr-Pennington* doctrine provides it immunity from antitrust liability based on the Georgia trade secret litigation and its alleged threats to sue suppliers for doing business with L-3. L-3 argues that the trade secret/data rights claims by Lockheed are actionable under the sham exception to immunity. While Lockheed may ultimately be able to show that its threats of litigation and ongoing trade secret litigation in Georgia are objectively reasonable, at this stage, the Court must take L-3's factual allegations as true and view them in the light most favorable to L-3. *Martin K. Eby*, 369 F.3d at 467. Thus, the Court cannot dismiss any of the antitrust claims based on the *Noerr-Pennington* defense at this time. L-3 has pled facts supporting its allegation that Lockheed's litigation is unreasonable and has been brought purely to impede competition from L-3. (Compl. ¶¶ 31, 29). Moreover, although summary judgment motions are pending in Georgia, no decision on the merits of Lockheed's trade secret claim has been announced, such that the Court could determine at a matter of law that the lawsuit was not objectively unreasonable.[9] The fact that suppliers have believed Lockheed and refused to deal with L-3 also does not show that, as a matter of law, Lockheed's claims are not objectively unreasonable. It is just as likely that certain suppliers simply want to avoid the cost and aggravation of any litigation and refuse to deal with L-3 not because they believe the merits of what Lockheed asserts (which would not necessarily prove

---

[9]The fact that the Georgia litigation is being heavily litigated does not determine the objective reasonableness of the litigation for many reasons. First, there was no preliminary injunction application, and thus there is not even a preliminary determination of Lockheed's likely success on the merits. Second, as mentioned, there has been no final determination on the merits. Third, it is plausible that Lockheed made the business decision to spend a few million dollars engaging in baseless trade secret litigation and threatening suppliers in order to deter potential foreign customers, whose contracts are worth hundred of millions of dollars, from considering contracting with its alleged only real competitor in the P-3 market–L-3.

objective reasonableness in any event), but because they believe that it is not worth the trouble of the fight. Thus, L-3's antitrust claims based on Lockheed's litigation acts will not be dismissed at this time. *California Motor*, 404 U.S. at 515-516 (reversing district court dismissal of antitrust allegations based on litigation where the allegations of the complaint, taken at face value, came within the sham exception to *Noerr-Pennington*). [10] Because none of L-3's antitrust claims, as stated, fail as a matter of law at this time, Lockheed's Motion to Dismiss Counts One -Four of the Complaint is denied.

## Analysis of Tortious Interference Claims

1.      Current Contracts

Lockheed moves to dismiss L-3's claim for tortious interference with the existing Korean Contract arguing that the claim is implausible under the *Twombly* standard. Neither *Twombly* nor any other legal authority supports such a contention. Indeed, L-3 has pled the classic case of tortious interference. Under Texas law, a plaintiff proves tortious interference with a contract by establishing: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997).

Lockheed asserts that L-3 has failed to adequately plead the third factor of tortious interference with existing contact–causation–because while L-3 pled that Lockheed is telling Korea and L-3's suppliers that L-3 is violating Lockheed data rights in performing the Contract, L-3 has also pled that no reasonable person would believe Lockheed's story. Thus, Lockheed argues, no injury

---

[10]The Court notes that the *Noerr-Pennington* is also potentially available to Lockheed as a defense to L-3's state law tortious interference claims. *Video Int'l Prod., Inc. v. Warner-Amex Cable Comms., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988). However, for the same reasons applicable to the antitrust claims, the Court cannot rely on this alleged immunity to dismiss the state law claims at this time.

could be caused by the spread of such an unbelievable story and no interference claim is stated.  As an initial matter, Lockheed mischaracterizes the language used by L-3 in its Complaint.  (Compl. 29).  L-3's reference to the believability of Lockheed's data rights assertions is pled in terms of what a "litigant with knowledge of the data that Lockheed has released by license or otherwise" would believe.  *Id.*  Clearly, there is a difference between what a litigant with full knowledge of the data and its history of disclosure would believe (*i.e.*, L-3) and what a person without such information (like L-3's suppliers and potential foreign customers) would believe.  More importantly, L-3 has pled that at least some of L-3's suppliers believed Lockheed's story and are therefore refusing to supply L-3.  L-3 has also pled that even some of the suppliers to its suppliers (L-3's sub-suppliers) believe Lockheed and refuse to supply the parts they owe to their customers.  Further, L-3 has also pled that Lockheed has expressly approached Korea and asserted that L-3 is unable to perform the Contract or is performing in violation of U.S. law.  L-3 has pled that each of the acts by Lockheed in approaching the market and making claims about L-3's ability to perform and/or Lockheed's alleged data rights has caused L-3 damage or will cause it damages if not enjoined.  There is nothing implausible about L-3's allegations, which fully satisfy each of the elements of tortious interference with existing contract under Texas law.

Lockheed also argues that its state law claims must be dismissed to the extent they are based on its litigation activities, including threats of litigation, under the "Texas litigation privilege."  The Court is not aware of any "Texas litigation privilege" that would apply here, nor does any of Lockheed's authority appear to support such an absolute defense/immunity.  The only Texas Supreme Court authority cited by Lockheed, which is the only authority arguably binding upon this Court, are cases involving claims of defamation, or its equivalent, based on statements made during

litigation. *See Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994); *James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982). These cases cite, and stem from, the Texas Supreme Court's determination in *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942), that "any communication ...uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel." L-3 is not asserting defamation claims here.

To the extent that Texas appellate courts have extended the *Reagan* court's holding to tortious interference cases, the Court finds the application of such an extension inconsistent in this case based on *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989). In *Sterner*, the court examined the "privilege" of legal justification in the context of a tortious interference with contract claim. *Id.* at 689-691. The court noted that "this privilege does not deny the interference but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract." *Id.* at 690. The defendant also bears the burden of proving that it is entitled to the legal justification defense, as opposed to the plaintiff having to prove a lack of justification as part of its right of recovery. *Id.*

Thus, contrary to Lockheed's assertions that there is a "Texas litigation privilege, which is not subject to any 'sham' exception,"[11] not only is the only apparently applicable privilege not an absolute privilege, it is one that Lockheed must prove.[12] To establish the privilege, Lockheed must

---

[11]Def.'s Br. at 19.

[12]This is comparatively more stringent that the *Noerr-Pennington* defense, as with that defense Lockheed has an absolute right/immunity based on bringing a lawsuit and, even with respect to threats, it would only have to show that they were made in anticipation of litigation. L-3 then bears the burden of showing that such litigation would be, or is, a sham.

prove that (1) its interference was done in a bona fide exercise of its own rights or (2) it has an equal or superior right to the subject matter compared to L-3. *Id.* at 691. As discussed above with respect to the *Noerr-Pennington* doctrine, the Court takes as true L-3's allegations that Lockheed's data rights assertions are unfounded and made in bad faith. Thus, faced with those allegations, Lockheed clearly cannot succeed on the defense of legal justification, which requires Lockheed to prove that its lawsuit is based on a bona fide exercise of its rights, at this preliminary stage of the litigation. As such, Lockheed's Motion to Dismiss Count Five of the Complaint is denied.

## 2.    Prospective Contracts

Lockheed's Motion to Dismiss L-3's claim for tortious interference with prospective contractual relations is similarly unsupported by a plain reading of the Complaint. To prove a cause of action for tortious interference with prospective contractual relations under Texas law, a plaintiff must establish the following elements: (1) a reasonable probability that the parties would have entered into a business relationship; (2) an independently tortious or unlawful act performed by the defendant that prevented the relationship from occurring, (3) the defendant's conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; and (4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference. *Brown v. Swett & Crawford of Texas,* Inc., 178 S.W.3d 373, 381-382 (Tex. App–Hous. [1st Dist.] 2005, no pet.); *Baty v. Protech Ins. Agency*, 63 S.W.3d 841 (Tex. App.–Hous. [14th Dist.] 2001, rev. den'd).[13] *See also Wal-mart Stores, Inc. v.*

---

[13]The Texas Supreme Court has not definitively established the elements necessary for a cause of action for tortious interference with prospective business relationships. *Nano-Proprietary, Inc. v. Canon, Inc.*, ----F.3d----, No. 07-50640, 2008 WL 2854816, at *6-7 (5th Cir. Jul. 25, 2008). The Fifth Circuit has noted its belief that there are two lines of thought in Texas Appellate courts regarding the elements, with

*Sturges*, 52 S.W.3d 711, 726-727 (Tex. 2001) (commenting on various elements of the tort and rejecting the notion that the plaintiff must prove malice or lack of justification or privilege).

Misapprehending L-3's burden, Lockheed argues that L-3 has failed to show that there is a reasonable probability that L-3 would have entered into a contract with anyone. While L-3 may ultimately be unable to prove the elements of its tortious interference claims, L-3 does not hold that burden at this stage of the litigation. *Twombly*, 127 S.Ct at 1966 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'").[14] L-3 has pled that it is essentially Lockheed's only competitor in the P-3 refurbishment market and that Canada, India, Taiwan, and Australia have all announced that they intend to refurbish their P-3 fleets. L-3 has also pled that it has won contracts in competition with Lockheed for P-3 contracts both with the U.S. Navy and clearly with Korea. With only two competitors, or even with very few competitors, in the market, it is apparent that L-3 is a likely candidate for any contract and thus has pled a reasonable probability that a foreign country would enter into a contract with it for P-3 refurbishment. *In Re Burzynski*, 989 F.2d 733, 739 (5th Cir. 1993) (reversing district court 12(b)(6) dismissal finding a reasonable probability of contract because otherwise prospective clients might not have been treated by plaintiff doctor if their insurers

---

the only difference being in the first element requirement of some courts of only a business relationship and other courts requiring a more formal contractual relationship. *Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 634-635 (5th Cir. 2002). As of yet, the Fifth Circuit has not determined the issue of the extent of the required relationship, and this Court finds it unnecessary to do so as well. *Id.* A contractual relationship versus a business relationship seems to be a distinction without difference in this case, as L-3 has pled that Lockheed is interfering with its ability to enter into contracts.

[14]None of the Texas state court cases cited by Lockheed involve dismissal at the pleading stage of the proceedings and are thus inapposite at this time. *See, e.g., Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475-476 (Tex. App.–Hous. [1st Dist.] 2006, rev. den'd) (determining claim for tortious interference based on summary judgment evidence).

denied coverage based on defendant insurance company's alarmist letter); *see also Amazon Tours, Inc. v. Quest Global Angling Adventures, LLC*, No. 3:03-CV-2551-M, 2004 WL 1788078 at *3 (N.D. Tex. Jun. 30, 2004) (refusing to dismiss tortious interference with prospective business relationship on 12(b)(6) motion). Thus, Lockheed's Motion to Dismiss Count Six of the Complaint is denied.

## CONCLUSION

For the reasons stated above, and viewing the Complaint in the light most favorable to Plaintiff L-3, the Court hereby DENIES Defendant's Motion to Dismiss in its entirety.

SO ORDERED.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE